**The below described is SIGNED.**

**Dated: January 08, 2010**

**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re<br><br>BRIAN A. KITTS,<br><br>Debtor.<br><br>J. KEVIN BIRD, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>WINTERFOX, LLC,<br><br>Defendant. | Bankruptcy Case No. 05-27158 JAB<br>Chapter 7<br><br><br><br>Adversary Proceeding No.<br>06-2250<br><br><br>Judge Judith A. Boulden |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above captioned adversary proceeding was tried before the Court on December 1, 3, and 7, 2009. The Plaintiff, J. Kevin Bird (Trustee), was represented by Adam Affleck and Aaron Millar. The Defendant, Winterfox, LLC (Winterfox), was represented by Sara E. Bouley and Gary Jubber.

By this proceeding, the Trustee seeks recovery under the Truth in Lending Act (TILA) related to two short-term, high-interest loans that Winterfox made to Brian Kitts (Debtor)

prepetition that are secured by property of the estate located in Park City. The Trustee asserts that the estate is entitled to actual damages suffered by the Debtor, statutory damages of up to $4,000 per loan, attorney's fees, and return and invalidation of all finance charges related to the loans. Winterfox raises a number of defenses including that the Debtor has incurred no damages and that TILA does not apply to Winterfox's transactions nor to the loans it made to the Debtor. As to the latter, Winterfox asserts that the real property was not a consumer's personal dwelling but instead a corporate asset owned by the Debtor's business and that the loans that it made to the Debtor were primarily for business purposes.

The Court has now considered the evidence properly before it, assessed the credibility of the witnesses, considered the arguments of counsel, and conducted an independent review of applicable law. Based on the foregoing, the Court makes the following findings of fact and conclusions of law.[1]

## I. JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a), and venue is appropriate under 28 U.S.C. §§ 1408 and 1409. The parties have agreed that this is a core proceeding under 28 U.S.C. §§ 157(b)(2).[2]

---

[1] These Findings of Fact and Conclusions of Law constitute the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 9014 and 7052, and incorporates by reference all of the Court's oral rulings made on the record during trial. Any of the findings of fact herein are also deemed to be conclusions of law and conclusions of law herein are also deemed to be findings of fact and shall be equally binding as both. The Court made various rulings during the trial including ruling on motions in limine. Those rulings as reflected on the record are incorporated into these Findings of Facts and Conclusions of Law. The Court also took under advisement Winterfox's Rule 52(c) Motion for Judgment on Partial Findings. Based on these Findings and Conclusions, the Court does not find it necessary to rule on Winterfox's Rule 52(c) Motion.

[2] *See* Pretrial Order at ¶ A.

## II.  FINDINGS OF FACT

1.      *In 1998, the Debtor purchased a property located at 2580 Bear Hollow Drive, Park City, Utah (Residence).[3]

2.      The Debtor lived in the Residence with his wife Laurie Kitts and their children.

3.      Since purchasing the Residence in 1998, legal title to the Residence has been held at various times in the names of "Brian Kitts," "Laurie Kitts," "Brian Kitts and Laurie Kitts," and "Sunpeak Holdings, Inc."

4.      Sunpeak Holdings, Inc. (Sunpeak) is a Nevada corporation that was, at all times, owned by the Debtor and by his wife, Laurie Kitts.

5.      On October 1, 2003, Sunpeak filed a chapter 11 voluntary petition.

6.      Sunpeak listed the Residence as an asset on Schedule A of its schedules.

7.      The Sunpeak chapter 11 bankruptcy case was dismissed on August 18, 2004.

8.      The Residence was encumbered over the years by various loans that were obtained by the Debtor, Laurie Kitts, and/or Sunpeak. Several liens also encumbered the Residence. The various encumbrances are set forth chronologically below, with a finding of whether the character of each encumbrance was either business or personal for the ultimate purpose of determining if TILA applies to Winterfox's loans.

### The Character of the Debt Secured by the Ingram Lien

9.      In 2001, the Debtor contracted with Ed Ingram (Ingram) to build a three-car garage as an addition to the Residence.

---

[3] Findings of fact marked with an asterisks were taken from the parties' Pretrial Order with some limited modifications.

10. Several months after the project began, the Debtor fired Ingram for having poured the foundation incorrectly.

11. *On October 5, 2001, Ingram recorded a Notice of Lien against the Residence for labor, services, and materials supplied to the Residence.

12. *On February 12, 2002, Ingram commenced an action in state court to foreclose his claimed lien and, on March 6, 2002, recorded a Lis Pendens against the Residence.

13. By December 2004, Ingram had threatened to foreclose if the Debtor did not pay off the alleged debt.

14. Because Ingram's lien arose from the building of the three-car garage to the Residence, any payment from the Winterfox loans to Ingram was attributable to personal, family, or household purposes.

### The Character of the Debt Secured by the Washington Mutual Lien

15. In November 2001, the Debtor and Laurie Kitts obtained a loan from Washington Mutual Bank (Washington Mutual Loan) in the principal amount of $605,000 secured by a trust deed on the Residence.[4]

16. In November 2001, the Debtor and Laurie Kitts were spending significant funds to finish the construction of the three-car garage they were constructing at the Residence, and they needed money to cover living expenses and to finish the construction project.

---

[4] Trustee maintains that the actual loan proceeds were $605,001 due to a payment made by the Debtor. This issue regarding a $1 discrepancy has no impact on the Court's findings or its analysis. The Court also questions how the Washington Mutual Loan closed with Ingram's Notice of Lien recorded against the property, but neither party explained or addressed this issue at trial.

17. In accordance with this purpose, the Washington Mutual Loan was used to (1) pay off three existing liens on the Residence, (2) bring property taxes on the Residence current, and (3) provide the Kitts with additional cash of $75,454.87.[5]

18. Two of the existing liens paid by the proceeds of the Washington Mutual Loan were attributable to secured business-related debts totaling $234,030.98.

19. The third lien paid off by the Washington Mutual Loan was a loan Laurie Kitts obtained in January 2001 from Crescent Mortgage for approximately $275,000 that was secured with a mortgage on the Residence.

20. Laurie Kitts obtained the $275,000 loan to purchase a home for her mother in the Park City area so that her mother could be closer to her, the Debtor, and their children.

21. Neither Laurie Kitts nor her mother viewed this purchase as a business investment.

22. Crescent Mortgage transferred the mortgage note to Provident Funding Associates, LP in or around February 2001 (Provident Funding Loan).

23. Laurie Kitts and her mother were title owners of the property, but both understood that the house was her mother's.

24. Laurie Kitts' mother decided to move to Salt Lake City and sold the property in March 2004.[6]

---

[5] The $1 discrepancy is also present here between the amount paid out to the Debtor and Laurie Kitts under the Washington Mutual Loan Settlement Statement and the amount the Debtor and Laurie Kitts testified was deposited into one of their accounts. The Court has used the amount provided to it in the Washington Mutual Settlement Statement. But again, the $1 discrepancy does not impact the Court's analysis.

[6] The testimony regarding the circumstances surrounding the payoff of the Provident Funding Loan and Laurie Kitts' release of the notice of interest filed against the property was unclear if not inconsistent. Laurie Kitts may have received a sum of money (approximately $20,000) from her mother to

25.	The Provident Funding Loan remained secured by the Residence until it was refinanced and paid off by the Washington Mutual Loan. The payoff amount for this loan according to the settlement statement was $277,327.49.

26.	Property taxes in the amount of $9,566.30 paid off by the Washington Mutual Loan were incurred and paid for the purpose of maintaining the Residence.

27.	A portion of the $75,454.87 in proceeds from the Washington Mutual Loan were used by the Debtor to continue to fund the construction of the three-car garage addition to the Residence.

28.	The Debtor testified and provided summaries showing that portions of the $75,454.87 were used for other personal items, investments, expenses and purchases.

29.	The aforementioned facts establish that the majority of the Washington Mutual Loan proceeds were used for personal, family or household purposes.[7]

### The Character of the Debt Secured by the Wells Fargo Loan

30.	In July 2002, Laurie Kitts obtained a line of credit secured by a trust deed on the Residence from Wells Fargo Bank (Wells Fargo Loan).

31.	Laurie Kitts obtained the Wells Fargo Loan to pay family living expenses and to complete the three-car garage addition to the Residence.

---

release the notice of interest. The testimony from Laurie Kitts' mother on this point and Laurie Kitts herself was less than clear. The Court finds, however, that even if Laurie Kitts received a sum of money from her mother that fact does not alone change the character of the payoff from a consumer to a business purpose.

[7] Excluding the settlement charges of $8,620.36, 39.24% of the Washington Mutual Loan proceeds were used to payoff the two business-related obligations. Even if the Court were to classify the $75, 454.87 as completely business related, then 51.89% of the Washington Mutual loan proceeds were used for business-related purposes. The testimony of the Debtor and Laurie Kitts and the documents filed in support of their testimony demonstrate, however, that more than 1.89% of remaining proceeds were actually used for personal, family, or household purposes.

32.     Laurie Kitts borrowed approximately $307,977.67 on the Wells Fargo Loan.

33.     The funds from the Wells Fargo Loan was used primarily for materials and labor for the three-car garage addition, medical payments, recreation, home utilities and repair, gifts, food and clothing for the Kitts family, and other household expenses.

34.     Additionally, some of these loan funds were used to add a bonus room above the three-car garage which contained a gym with high-end exercise equipment.

35.     Laurie Kitts was employed as a personal trainer beginning sometime around 2004 and she used the gym in the Residence from time to time to train her clients.

36.     The evidence provided at trial did not establish that the gym was used exclusively for Laurie Kitts' personal training sessions.

37.     The Debtor's primary business office has been located at the Residence since at least 2004.

38.     The testimony and evidence presented at trial establish that a majority of the Wells Fargo Loan proceeds were used for personal, family, or household purposes.[8]

**The Winterfox First and Second Loans**

39.     In the fall of 2004, the Debtor was facing foreclosure of the Residence as a result of the following encumbrances: Ingram's lien (for which an action for foreclosure was pending); the Wells Fargo Loan (for which a September 20, 2004 notice of default was recorded); and the Washington Mutual Loan (for which a November 5, 2004 notice of default was recorded).

---

[8]     The testimony of both the Debtor and Laurie Kitts regarding the use of these loan proceeds was supported by Ex. 74, 75A, 76A, 77, and 78A which were all admitted into evidence and establish that a majority of the loan proceeds were used for personal, family, or household purposes. This conclusion is not impacted by the increase in amount owed on the Wells Fargo Loan when it was paid off in December 2004.

40. To prevent the loss of the Residence, the Debtor sought a new loan to pay off these foreclosing liens.

41. The Debtor employed Michael Falk (Falk) to find a lender to provide him with financing to pay off existing encumbrances on the Residence.

42. The Debtor and Falk had worked together on various transactions prior to the fall of 2004.

43. Falk had attempted to get conventional financing for the Debtor so that he could refinance the Residence before November 2004, but he was unsuccessful. In November or December 2004, Falk contacted Aaron Olivarez (Olivarez) to determine whether Olivarez worked with a lender that could give the Debtor a loan.

44. During this time, Olivarez was employed as a loan officer for Citiwide Mortgage Services and was actively soliciting or originating loans for that company.

45. Olivarez was also providing consulting and loan advice to Winterfox at this time.

46. Winterfox was a hard money lender.

47. Falk provided a packet of information concerning the Debtor and the Residence to Olivarez, including (to the best of Olivarez's memory) a title report, a credit report, an appraisal, and a uniform loan application that the Debtor had already filled out.

48. The packet and the information included in it assisted Olivarez in determining whether he should recommend that Winterfox give the Debtor a loan.

49. Neither one of the parties were able to produce this packet at trial.

50. After being contacted by Falk, Olivarez proposed Winterfox to Falk as a potential lender for the Debtor.

51. In December 2004, Falk arranged for Olivarez and Thomas Adams (Adams), who worked for Winterfox, to inspect the Residence to verify its value as collateral.

52. It was during this walk-through that Falk introduced the Debtor to Olivarez and Adams.

53. It was also during this walk-through that Olivarez learned that the Debtor and his family were living in the Residence.

54. *On or about December 8, 2004, the Debtor entered into a $1,350,000 loan with Winterfox evidenced by a loan agreement and a note and secured by a first position trust deed on the Residence (First Loan).

55. *As part of the First Loan, the Debtor executed and delivered to Winterfox a Trust Deed Note dated December 8, 2004 with interest on the principal amount at the rate of 12% per annum over the 47-day term of the loan.

56. *To secure the First Loan, the Debtor executed and delivered to Winterfox a deed of trust dated December 8, 2004 against the Residence which was recorded December 10, 2004 in Summit County, Utah.

57. Legal title to the Residence was held by Sunpeak prior to the First Loan being executed.

58. The First Loan was made to the Debtor individually so the Debtor transferred legal title to the Residence from Sunpeak to the Debtor just prior to signing the note and deed of trust. Minutes after executing the First Loan, the Debtor transferred title to the Residence back to Sunpeak.

59.  *The First Loan was insufficient to pay off the Debtor's existing obligations, so Winterfox agreed to loan the Debtor an additional sum to complete the amount needed to make up the shortfall.

60.  *This second loan was made between December 23 and December 31, 2004, at which time Winterfox loaned the Debtor an additional $39,603.47 evidenced by a second note and secured by a second position trust deed on the Residence (Second Loan).

61.  *To secure the Second Loan, the Debtor executed and delivered to Winterfox a deed of trust dated December 23, 2004 against the Residence which was recorded March 1, 2005 in Summit County, Utah.

62.  Legal title to the Residence was held by Sunpeak prior to the Second Loan being executed.

63.  The Second Loan was made to the Debtor individually so the Debtor once again transferred legal title to the Residence from Sunpeak to the Debtor just prior to signing the note and deed of trust. Minutes after executing the Second Loan, the Debtor transferred title to the Residence back to Sunpeak.

64.  In connection with the loans Olivarez performed the following tasks:

   a. Inspected the information in the packet that Falk provided to Olivarez.

   b. Followed up with the title company regarding liens on the Residence.

   c. Evaluated the proposed transaction, and made recommendations to Winterfox.

   d. Negotiated the terms of the loan with Falk and drafted the loan agreement.

   e. Provided necessary information to the title company that handled the closing (Deer Creek Title) to complete loan documents, and prepared a letter on Winterfox's letterhead

to Deer Creek Title directing how he, Falk, and Winterfox should be paid from the $87,500 "Loan Origination Fee" (Winterfox's Fee Letter).[9]

65.    Olivarez attended the closings at Deer Creek Title and, afterward, Olivarez called Winterfox to ensure the funding of the First and Second Loans.

66.    Under the terms of the First and Second Loans, the loans were due and payable on January 24, 2005.

67.    The Debtor did not repay the loans by January 24, 2005.

68.    An Addendum To Trust Deed Note executed on February 23, 2005 (which references the entire amounts loaned under the First and Second Loans) indicates that an extension was granted to the Debtor through March 21, 2005 for additional fees and that a "'deed in lieu' shall be deposited with [Winterfox]. . ."[10]

69.    The Debtor signed a quit-claim deed transferring legal title to the Residence from Sunpeak to the Debtor on April 22, 2005 (the April 22nd Deed).

70.    The April 22nd Deed was recorded on June 9, 2005.

71.    When the Debtor did not pay off the First and Second Loans by the due date, Winterfox threatened to record the deed in lieu of foreclosure.

72.    *The Debtor has never made a payment to Winterfox on either the First Loan or the Second Loan.

---

[9]    *See* Def. Ex. 569.

[10]    Trustee's Ex. 3.

**The Final Analysis of the Character of the Underlying Debt Paid by the First and Second Loans**

73.　　The aforementioned facts show the that the proceeds of the First and Second Loans were used in the following manner:[11]

| Disbursement Summary of First and Second Loans - $1,389,603.47 | | | | |
|---|---|---|---|---|
| Payee | Total | Related to Business or Unknown Purposes | Used for Personal, Family or Household Purposes | Fees |
| Ed Ingram | *$113,353.59 | | $113,353.59 | |
| Washington Mutual Bank | *$700,277.32 | $301,819.53 | $398,457.79 | |
| Wells Fargo Bank | *$330,583.34 | $127,996.81 | $202,586.53 | |
| Utah Mortgage Center | | *$50,000.00 | | |
| NevWest Corporation | | *$45,000.00 | | |
| John Max Van App & Levon Koshkaryan | | *$22,500.00 | | |
| Utah State Tax Commission (Debtor) | | *$ 8,270.43 | | |
| Internal Revenue Service (Laurie Kitts) | | *$28,482.87 | | |
| Aaron Olivarez | *$12,500.00 | | | $12,500.00 |
| Michael Falk | *$12,500.00 | | | $12,500.00 |
| Winterfox | *$62,500.00 | | | $62,500.00 |
| Deer Creek Title | $3,635.92 | | | $3,635.92 |
| **Totals** | **$1,389,603.47** | **$584,069.64** | **$714,397.91** | **$91,135.92** |
| | | **42%** | **51.4%** | **6.6%** |

---

[11]　　The Trustee has explained that the amount of the funds paid out to Deer Creek Title was incorrectly calculated in the Pretrial Order and that the actual fee amount disbursed was not $3,774.08 but instead $3,635.92.

74.     The majority of the First and Second Loan proceeds were used for personal, family, or household purposes.[12]

## The Bankruptcy Filing

75.     On May 4, 2005, the Debtor filed a voluntary chapter 11 bankruptcy petition commencing the above-captioned bankruptcy case, which was later converted to chapter 7 on December 11, 2006 (the "Bankruptcy Case").

76.     The Debtor's bankruptcy schedules indicate that Winterfox's secured claim is "disputed."

77.     This Adversary Proceeding was commenced on April 26, 2006 by the Debtor, and the Trustee was substituted as plaintiff on April 24, 2007.

## Truth in Lending Act (TILA) Disclosures

78.     Sometime in the fall of 2005, counsel for the Debtor, Russell S. Walker (Walker), requested from Winterfox's counsel copies of any TILA notices and disclosures that Winterfox had prepared and sent to the Debtor in connection with the First and Second Loans.

79.     In February 2006, Winterfox's counsel provided copies to Walker of certain TILA notices and disclosures (the "TILA Disclosures") alleged to have been sent to the Debtor.

80.     Winterfox (through its representative) testified that documents labeled with Bates Nos. WF000001 through WF000017 constitute the disclosures sent by Winterfox in connection with the First Loan on December 5, 2004.

---

[12] Even if the Court were to include the 6.6% in Fees into the business purpose calculation, the majority of the loan funds would still be attributed to personal, family, or household purposes.

81. Winterfox (through its representative) also testified that the documents labeled with Bates Nos. WF000018 through WF000036 constitute the disclosures sent by Winterfox in connection with the Second Loan on December 29, 2004.

82. Most of the TILA Disclosures have a "MAILED" stamp on them with a date written in by Marco Fields (Fields) who prepared the TILA Disclosures and reviewed comparables in the provided appraisal to determine the value of the Residence.

83. Fields testified that the dates that were handwritten on the TILA Disclosures were written by her.

84. Fields testified in her deposition that the dates that she wrote on the TILA Disclosures were inadvertently inaccurate.

85. At trial, Fields testified that the TILA Disclosures may have been sent on December 5 and 29, 2004 but she had no independent recollection of doing so.

86. The software company that created the forms used for the TILA Disclosures testified (through deposition) that some of these forms allegedly sent on December 5 and 29, 2004 were not released to the public, even in beta form, until April 2005.

87. Based on this testimony, the Court determines that the TILA Disclosures could not have been prepared by Winterfox nor sent to the Debtor any earlier than April 2005.

88. In the TILA Disclosures, Winterfox further admits that the loan applicant was "Brian Kitts" and that "upon taking title to the real property [at 2580 Bear Hollow Drive], [Brian Kitts'] occupancy status will be as follows: Primary Residence."

89. The TILA Disclosures prepared by Winterfox provided incomplete and inaccurate information for the First and Second Loans.

90.     Winterfox has stipulated and agreed that for the purposes of this trial that the TILA Disclosures were not sufficient to meet the requirements of TILA.

From the above Findings of Fact, the Court makes the following Conclusions of Law.

### III. CONCLUSIONS OF LAW

1.      This Court has jurisdiction over this matter under 28 U.S.C. § 1334.

2.      This matter is a "core" proceeding under 28 U.S.C. § 157, and this Court may enter a final order herein.[13]

3.      Venue is properly laid in this Court under 28 U.S.C. § 1409.

### TILA Coverage — 15 U.S.C. § 1601 *et seq.*

4.      Loans are covered by TILA if they are consumer credit transactions extended by a creditor to a natural person.[14]

5.      Loans are consumer credit transactions when they are "primarily for personal, family, or household purposes."[15]

6.      The Debtor's motivation for getting the First and Second Loans was to save his Residence from foreclosure and, therefore, he obtained the First and Second Loans for a personal, family, or household purpose.

7.      Some courts characterize the loan for TILA purposes by the use of the majority of the proceeds.[16]

---

[13]    This is not a core complaint as defined by 28 U.S.C. § 157(a), but the parties have stipulated to this Court's jurisdiction in the Pretrial Order and has consented to this Court entering a final order.

[14]    15 U.S.C. § 1602(h).

[15]    *Id.*

[16]    *See Stillman v. First Nat'l Bank of Sioux City*, 791 P.2d 23 (Idaho 1990).

8.      For these courts, in the context of a refinancing transaction, the character of the new loan is determined by reference to the original use of the proceeds from the existing loans that are paid off.[17]

9.      Following this approach, the majority of the proceeds of the First and Second Loans were used for personal, family, or household purposes.

### Winterfox Was Not a Creditor Under TILA

10.     A lender is a "creditor" under TILA if the lender (1) *originates* two consumer loans that qualify as high-cost mortgages within a twelve month period, or (2) *originates* one consumer loan that qualifies as a high-cost mortgage through a mortgage broker.[18]

11.     In December 2004, neither TILA nor Regulation Z found at 15 C.F.R. § 226.2(a) defined "originates" or "mortgage broker." As a result, the meaning of the TILA statute is derived by giving each word its plain meaning unless the literal application is at odds with the intent of the legislation, the literal application would produce an absurd result, or the statutory language is ambiguous.[19]

12.     "Originate" is "to give origin or rise to; initiate; [or] invent."[20]

13.     Under TILA, the lender, here Winterfox, must be the party that "originates" the loans.

---

[17]    *See, e.g., Toy Nat'l Bank v. McGarr*, 286 N.W.2d 376, 378 (Iowa 1979).

[18]    15 U.S.C. § 1602(f).

[19]    *In re Wilbur*, 344 B.R. 650, 653 (Bankr. D. Utah 2006).

[20]    *See* http://dictionary.reference.com/browse/originate (December 30, 2009); *see also* WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 829 (1984) indicating that "originate" means "to bring or come into being."

14. Falk had been retained by the Debtor to find financing to save the Residence from foreclosure.

15. When Falk was unable to obtain conventional financing, Falk approached Olivarez to obtain financing for the Debtor.

16. All witnesses involved in the transaction while it was in its preliminary stages agree that it was Falk who initiated contact with Olivarez and subsequently Winterfox.

17. Falk prepared and handed over the Debtor's financial packet to Olivarez.

18. Olivarez did not actively solicit business from the Debtor and did not, on behalf of Winterfox, initiate or "originate" the First and Second Loans.

19. As a result, Winterfox cannot be considered a "creditor" under TILA.

20. Furthermore, the Court finds that Olivarez was not a "mortgage broker" under TILA.

21. Again, TILA requires that the lender originate the loans through a "mortgage broker." The Court, therefore, focuses its analysis on Olivarez as opposed to Falk.

22. "Mortgage broker" is defined as: "An individual or organization that markets mortgage loans and brings lenders and borrowers together."[21]

---

[21] Black's Law Dictionary (8th ed. 2004) (electronic version) referring the reader to the definition of "broker" when examining the definition of "mortgage broker" found at westlaw.com (December 30, 2009). *See also* http://dictionary.reference.com/browse/mortgage+broker (December 30, 2009) defining "mortgage broker" as: "The matchmaker between a homebuyer and a lender with the goal of them originating a mortgage loan. The broker draws from a pool of various lenders to find the right match." The Trustee urges the Court to adopt the definition of "mortgage broker" now found in Regulation Z which defines a "mortgage broker" as "a person, other than an employee of a creditor, who for compensation or other monetary gain, or in expectation of compensation or other monetary gain, arranges, negotiates, or otherwise obtains an extension of consumer credit for another person." *See* 12 C.F.R. 226.36(a). But the Court declines to do so because this definition was not included in the C.F.R. at the time of the transaction.

23. The definition of a "mortgage broker" has been further defined in the case of *Hodges v. Swafford*.[22] In *Hodges*, Swafford (the home owner), who was unable to obtain conventional financing through a mortgage company, asked Seitzinger, the agent of the mortgage company, if she could help him save his home.[23] Seitzinger contacted Hodges, her brother, and negotiated a land contract between Swafford and Hodges and his wife (Hodgeses).[24] Seitzinger prepared the land contract, she ordered an appraisal, she originated a $57,400 loan for the Hodgeses so that they could provide financing to Swafford, she set up the date and time for the closing of both transactions, and she met with Swafford.[25] The *Hodges* court stated: "In sum, Seitzinger brought the parties together, acted as their liaison prior to closing, and prepared the documents necessary to complete the transaction."[26]

24. Olivarez's actions are distinguishable from those of Seitzinger in *Hodges*. Admittedly, Olivarez acted as a liaison prior to closing and prepared documents necessary to complete the First and Second Loans, but he did not bring the parties together. He was not actively shopping loans for the benefit of Winterfox which is precisely what the mortgage company and Seitzinger did in the *Hodges* case. It was Falk that approached Olivarez, and it was Falk that brought the parties together.

25. For the reasons stated above, the Court concludes that TILA does not apply to the First and Second Loans.

---

[22] 863 N.E.2d 881 (Ind. Ct. App. 2007), *opinion amended on rehearing*, *Hodges v. Swafford*, 868 N.E.2d 1179 (Ind. Ct. App. 2007).

[23] *Id*. at 884.

[24] *Id*.

[25] *Id*.

[26] *Id*. at 887.

**Winterfox Is Not Entitled to Attorney's Fees and Costs for Defending TILA Action**

26. The Tenth Circuit follows the American Rule, which provides that the prevailing party is not entitled to collect a reasonable attorney's fee from the losing party unless the fees are awarded by statute or an underlying contract.[27]

27. There is no provision for a recovery of attorney's fees under TILA for a successful defense against a TILA action.

28. Winterfox has no basis to recover its attorney's fees under TILA.

29. A creditor that successfully defends a TILA action may recover attorney's fees only for aspects of litigation that are specifically provided for under the note.[28]

30. The notes for the First and Second Loans only allow Winterfox's attorney's fees for the "costs and expenses of collection," and Winterfox's defense of the Trustee's TILA action is not an effort to collect the debt. Therefore, Winterfox cannot recover its attorney's fees or costs.

## IV. CONCLUSION

Based upon the foregoing, the Court hereby determines as follows:

The Trustee's Complaint is DISMISSED.

------------------------------------------- END OF DOCUMENT ---------------------------------

---

[27] *In re Shaw*, 114 B.R. 291, 293 (Bankr. D. Utah 1990).

[28] *See, e.g., Hefferman v. Bitton*, 882 F.2d 379, 384 (9th Cir. 1989).

**CERTIFICATE OF SERVICE**

    A copy of the within **Findings of Fact and Conclusions of Law** shall be served upon the following at the listed address by the Bankruptcy Noticing Center.

Adam S. Affleck
Aaron Millar
Prince, Yeates & Geldzahler
City Center 1
Ste. 900
175 East 400 South
Salt Lake City, UT 84111

Gary E. Jubber
Sara E. Bouley
Fabian & Clendenin, P.C.
215 South State Street
Suite 1200
Salt Lake City, UT 84111