**The below described is SIGNED.**

Dated: February 08, 2011 _____
JOEL T. MARKER
U.S. Bankruptcy Judge



_____

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF UTAH

# CENTRAL DIVISION

| | |
|---|---|
| In re: <br><br> BRIAN A. KITTS, <br><br>                    Debtor. | Bankruptcy Case No. 05-27158 <br><br> Chapter 7 |
| J. KEVIN BIRD, Chapter 7 Trustee, <br><br>                    Plaintiff, <br> v. <br> WINTERFOX, LLC, <br><br>                    Defendant. | Adversary Proceeding No. 06-2250 <br><br> Judge Joel T. Marker |

**POST-REMAND FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In this adversary proceeding, the Trustee seeks recovery under the Truth in Lending Act (TILA) related to two high-interest prepetition bridge loans that Winterfox made to Brian Kitts (Debtor) that are secured by real property in Park City, Utah. After a three-day trial in December 2009, the Court issued its Findings of Fact and Conclusions of Law concluding *inter alia* that TILA did not apply to Winterfox and dismissing the Complaint. The Trustee appealed the Court's Order Dismissing Adversary Proceeding as well as its Order Granting Winterfox, LLC's

1

Motion to Strike the Trustee's Amended Complaint and Order Striking Objection to Claim of Winterfox, LLC to the United States District Court for the District of Utah, although he voluntarily dismissed the claim objection appeal.  The District Court affirmed the Court's decision to strike the Trustee's Amended Complaint along with other findings and conclusions but reversed on the issue of whether TILA applied to Winterfox and remanded the matter "for further fact finding concerning damages for violation of the federal Truth in Lending Act (TILA) as well as the Trustee's request for attorney's fees."[1]

In compliance with the District Court's mandate, the Court accepted additional briefing by both parties; took further evidence in the form of the Trustee's Exhibits 81 through 84, Supplemental Declaration #2 of Aaron B. Millar, Individual Estate Property Record and Report (Form 1), and Estate Cash Receipts and Disbursements Record (Form 2); and heard oral arguments at a hearing on December 17, 2010.  The Court has now thoroughly reviewed the record, considered the additional evidence and arguments of the parties, and conducted an independent inquiry into applicable case law.  Based thereon, the Court issues the following Post-Remand Findings of Fact and Conclusions of Law.[2]

## I. UNDISPUTED ISSUES

As an initial matter, the Court must remind the parties of the limited scope of the District Court's remand "for further fact finding concerning damages for violation of the Federal Truth in Lending Act (TILA) as well as the Trustee's request for attorney's fees."  "The rule of mandate requires a lower court to act on the mandate of an appellate court, without variation.  The mandate rule compels compliance on remand with the dictates of a superior court and forecloses

---

[1] Order on Appeal from Bankruptcy Court, p. 19.
[2] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.  Any of the findings of fact herein are also deemed to be conclusions of law and conclusions of law herein are also deemed to be findings of fact and shall be equally binding as both.

relitigation of issues expressly or impliedly decided by the appellate court. Furthermore, under the mandate rule, a lower court cannot give any other or further relief beyond the scope of the mandate. Nor may the lower court review the mandate, even for apparent error."[3] Despite these fundamental principles regarding the Court's role on remand, some issues were raised in the post-remand briefing and oral arguments that were either explicitly or implicitly decided by the Court and the District Court or are otherwise clearly established in the record.

### A.   Two Winterfox Loans

Winterfox argues in its Post-Remand Brief that the two transactions with the Debtor should be considered as one loan for several factual and legal reasons,[4] but both the Court and the District Court have already either explicitly or at least implicitly concluded that Winterfox made two distinct loans to the Debtor.[5] And even if it were appropriate to reconsider that conclusion, which it is not, the Court sees no basis in Winterfox's argument for doing so.

### B.   High-Cost Mortgages

Winterfox is correct that the Court did not initially determine whether the loans were high-cost mortgages under the Home Ownership and Equity Protection Act (HOEPA) because it determined that TILA did not apply to Winterfox for other reasons, but the evidence supporting such a conclusion was presented at trial and the District Court expressly concluded "that at least one of the loans was a high-cost mortgage."[6] Winterfox also does not challenge that both loans qualify as high-cost mortgages from an interest-rate standpoint based on evidence presented at trial regarding the APRs of those loans.[7] However, Winterfox does argue that the loans were not

---

[3] 5 AM. JUR. 2D APPELLATE REVIEW § 740 (November 2010).
[4] *See* Winterfox's Post-Remand Brief, pp. 13-14.
[5] Findings of Fact and Conclusions of Law, p. 7 *et seq.*; Order on Appeal from Bankruptcy Court, p. 10 *et seq.*
[6] Order on Appeal from Bankruptcy Court, p. 13.
[7] *See* Winterfox's Post-Remand Brief, p. 9 n. 47.

3

high-cost mortgages because they were not secured by the Debtor's "principal dwelling." This argument is not well taken.

Both the Court and the District Court were fully aware of the issues involving the transfers between the Debtor and his company Sunpeak Holdings, Inc. Based on the evidence presented at trial, the Court made findings and reached conclusions that the loans were "consumer credit transactions" because they were "primarily for personal, family, or household purposes" to refinance and save the Debtor's principal dwelling from foreclosure.[8] Moreover, the District Court specifically ruled that these findings were not clearly erroneous.[9] And the District Court's alternative ruling as to why TILA applies to Winterfox necessarily relies on the conclusion that Winterfox is a "creditor" because it originated at least one high-cost mortgage through a mortgage broker.[10]

### C. Striking of Amended Complaint and Claim Objection

The Trustee voluntarily dismissed his appeal of the Court's Order Striking Objection to Claim of Winterfox, LLC, and the District Court affirmed the Court's Order Granting Winterfox, LLC's Motion to Strike the Trustee's Amended Complaint that sought to add additional parties, add a Utah Residential Mortgage Practices Act claim, and "clarify" that the Trustee sought relief in the form of an objection to Winterfox's proof of claim.[11] The Trustee does not directly challenge any of these decisions, but he does challenge their import in connection with his attempt to avoid estate liability for payment of unpaid finance charges and fees included in Winterfox's proof of claim. The Court will discuss this further in the Disputed Issues section below.

---

[8] Findings of Fact and Conclusions of Law, p. 3 *et seq.*
[9] Order on Appeal from Bankruptcy Court, p. 10.
[10] *Id.* at pp. 13-17.
[11] The parties also stipulated in June 2009 to dismissal of the rescission, Utah Consumer Credit Code, and misrepresentation counts of the original Complaint.

4

**D.    Statutory Damages**

Finally, after some initial confusion, the parties agree that the version of TILA in effect at the time of the Winterfox loans provides for statutory damages of "not less than $200 or greater than $2,000" per violation.[12] Based on the facts that Winterfox made two loans to the Debtor, provided no disclosures at all, and attempted in this litigation to cover up its failure to disclose with fabricated documents,[13] the Court concludes that the maximum statutory damages of $2,000 for each violation are appropriate for total statutory damages of $4,000.

## II. DISPUTED ISSUES

TILA provides for four specific categories of damages that a plaintiff may recover against a high-cost mortgage lender for failure to provide the required disclosures — (1) "any actual damage sustained by such person as a result of the failure"; (2) statutory damages; (3) "the costs of the action, together with a reasonable attorney's fee as determined by the court"; and (4) "an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material."[14] The Court has already determined that the Trustee is entitled to $4,000 in total statutory damages and will address the remaining damage categories in turn.

**A.    Actual Damages**

In order to recover actual damages under 15 U.S.C. § 1640(a)(1),[15] the Trustee must demonstrate the Debtor's "detrimental reliance" on Winterfox's failure to provide the required TILA disclosures.[16] This requires the Trustee to "establish a causal link between [Winterfox's]

---

[12] 15 U.S.C. § 1640(a)(2)(A)(iii) (1995).
[13] *See* Findings of Fact and Conclusions of Law, pp. 13-15.
[14] 15 U.S.C. § 1640(a)(1)-(4) (1995).
[15] All future statutory references are to title 15 of the U.S. Code (1995) unless otherwise indicated.
[16] *Vallies v. Sky Bank*, 591 F.3d 152 (3d Cir. 2009).

5

noncompliance and [the Debtor's] damages"[17] and can be supported if he can show that, "had [the Debtor] been properly informed, [the Debtor] would have engaged in a different or less-expensive transaction."[18] The Trustee admits that proving actual damages is difficult.[19]

The record shows that the Debtor was a relatively sophisticated consumer with a substantial history of real property loan transactions including hard-money loans, that he did not even take his glasses to the loan closing which he requires to read, and that he and his agents expended substantial effort trying to find a lender to prevent foreclosure but that Winterfox was the only lender that they could find to meet their needs.[20] Most importantly, however, the Trustee failed to show that the Debtor would or even could have obtained more favorable financing, particularly within the time frame required to prevent foreclosure, if he had received appropriate TILA disclosures.

The Debtor testified that he and his agent Michael Falk (Falk) "first started looking at" the Debtor's existing loan issues in the spring of 2004.[21] The Debtor had pre-approval for a jumbo loan in June 2004 that fell apart in mid-September, and Falk was generally unable to get conventional financing.[22] The Debtor told Falk that he needed a loan "in the end of November 2004 or the beginning of December 2004" to prevent foreclosure, and Falk was "fully aware of the situation" including that the Debtor "was in a panic for [Falk] to get something done."[23] The Debtor was unaware of any other lenders who were ready, willing, and able to provide the loan he needed,[24] and Winterfox's consultant Aaron Olivarez (Olivarez) testified that other

---

[17] *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1028 (11th Cir. 2001).
[18] *Perrone v. GMAC*, 232 F.3d 433, 436 (5th Cir. 2000).
[19] *See Vallies*, 591 F.3d at 158.
[20] Findings of Fact and Conclusions of Law, pp. 3-11; Trial Tr. 12/3/09 61:10-62:15.
[21] Trial Tr. 12/1/09 189:25-190:9.
[22] Findings of Fact and Conclusions of Law, p. 8 #43; Trial Tr. 12/1/09 188:2-189:16.
[23] Trial Tr. 12/3/09 66:7-19.
[24] Trial Tr. 12/3/09 40:25-46:6.

6

prospective lenders (both conventional and subprime) with whom the Debtor and Falk were working either would not fund this kind of loan while the property was in foreclosure or could not fund it within the necessary time frame.[25]

The testimony of Winterfox's expert David Luna was at least equally credible and compelling if not moreso than the Trustee's expert Rob Haertel (Haertel) as to the availability and terms of other possible financing options during the relevant time frame.[26] The Trustee also stretches Haertel's testimony too far in alleging that Haertel himself would have made a better loan to the Debtor when Haertel stated that "based on the competition and what lenders would do and, frankly, what we would do, we were making loans, most of our loans, at 12 percent and 3 points at that point in time."[27] Finally, the fact that Winterfox made the bridge loans to the Debtor with a "primary exit strategy" of being paid off with subsequent take-out financing does not support the Trustee's position.[28] At best, it shows that Winterfox believed that take-out funding sources would be available *eventually*, but it also supports the evidence that alternative financing was not available within the Debtor's necessary time frame to avoid foreclosure — and the Debtor was never able to obtain take-out financing in any event.

In sum, the Trustee has failed to sustain his burden to demonstrate that the Debtor detrimentally relied on Winterfox's non-disclosure. Accordingly, the Court awards no actual damages to the Trustee under § 1640(a)(1).

**B.      Recovery of Prepaid Finance Charges**

On the issue of prepaid finance charges in connection with the Winterfox loans, the parties do not dispute the fact that Winterfox charged $87,500 in "loan origination fees" to the

---

[25] Trial Tr. 12/1/09 115:17-117:22.
[26] Trial Tr. 12/3/09 190:1-191:15; Trial Tr. 12/7/09 170:11-177:15.
[27] Trial Tr. 12/3/09 190:21-191:15; Trial Tr. 12/7/09 170:11-174:19.
[28] Trial Tr. 12/1/09 71:17-72:1.

7

Debtor, $62,500 of which went to Winterfox, $12,500 to Falk, and $12,500 to Olivarez. The parties also do not dispute that the $87,500 was paid from the Winterfox loan proceeds rather than being paid out of pocket by the Debtor. The major dispute is over the purely legal question of whether prepaid finance charges that are paid from the loan proceeds, rather than finance charges paid out of pocket by the Debtor, qualify as "finance charges . . . **paid by the consumer**" under § 1640(a)(4). Winterfox also argues in the alternative that prepaid finance charges should not be awarded as damages because its "failure to comply [with the HOEPA requirements of § 1639] is not material."

The Court agrees with the Trustee that prepaid finance charges qualify as compensable damages under § 1640(a)(4). As Winterfox's manager George Bybee testified at trial, the $62,500 paid to Winterfox is "referred to as points. That's interest that's paid up front out of the proceeds of the loan. In other words, I supply the same amount of money they return back to me."[29] That testimony is also supported by the settlement statement for the first Winterfox loan which indicates that the $87,500 was paid by the Debtor to Winterfox at settlement from the additional funds that he borrowed from Winterfox for that very purpose.[30] Furthermore, the District Court stated that "Mr. Kitts paid a total of $87,500 in fees designated as 'loan origination fees' in connection with the loans,"[31] which is admittedly the only payment of any kind that the Debtor has ever made on the Winterfox loans.[32] This view also comports with both the formal nature of the underlying financial transaction as well as the remedial nature of TILA and the equity protection purpose of HOEPA.

---

[29] Trial Tr. 12/1/09 p. 44:16-23.
[30] Trial Ex. 7 at p. WF 2.
[31] Order on Appeal from Bankruptcy Court, p. 5.
[32] Findings of Fact and Conclusions of Law, p.11 #72.

8

The Court also agrees with the Trustee that Winterfox's failure to provide any of the required HOEPA disclosures constitutes a material failure to comply with § 1639.[33] Winterfox merely tries to incorporate its successful argument against an award of actual damages under § 1640(a)(1) into § 1640(a)(4), but those damage provisions are cumulative and their standards are not the same. Whereas § 1640(a)(1) is concerned with the actual monetary damages suffered by the consumer and required the Trustee to demonstrate the Debtor's detrimental reliance on Winterfox's failure to disclose, § 1640(a)(4) is concerned with the adequacy of the disclosure itself and only requires a mathematical calculation of "the sum of all finance charges and fees paid by the consumer" to support its separate damage award. Accordingly, the Court awards the Trustee damages of $87,500 for the Debtor's prepaid finance charges under § 1640(a)(4).

**C.   Invalidation of Unpaid Finance Charges and Fees**

In addition to a damage award under § 1640(a)(4) for prepaid finance charges, the Trustee also attempts to avoid any estate liability for the unpaid finance charges and fees included in Winterfox's proof of claim.[34] But the Court is not writing on a clean slate. The Court has thoroughly reviewed the record in this case and agrees with Winterfox that this line of argument has already been ruled upon and is the law of the case. First, the Court struck the Amended Complaint that the Trustee belatedly attempted to file, a decision which was affirmed on appeal. Second, the Court ruled at trial on Winterfox's Motion to Limine that evidence of unpaid interest and extension fees was excluded. Third, the Court struck the Trustee's objection to Winterfox's proof of claim based on the Amended Complaint and Motion in Limine rulings, a decision which the Trustee appealed but later voluntarily dismissed.

---

[33] *See, e.g.*, *In re Jackson*, 245 B.R. 23, 32 (Bankr. E.D. Pa. 2000).
[34] *See, e.g.*, *In re Dawson*, 411 B.R. 1 (Bankr. D.D.C. 2008).

9

The Trustee struggles mightily to recharacterize and distinguish those decisions from the present relief that he is seeking. Specifically, he frames the Court's and the District Court's prior decisions as involving damage recovery theories in the nature of offset or recoupment, whereas the relief he requests as to unpaid finance charges and fees is really not a damage recovery at all — rather, it is a declaratory attempt by the estate to "avoid liability" for those amounts, i.e., to reduce the allowed amount of Winterfox's proof of claim. But the Court can discern no substantive difference in these theories proposed by the Trustee.[35] Indeed, accepting the Trustee's position would effectively render meaningless his prior efforts to supplement and "clarify" the relief he sought as well as the Court's and the District Court's rulings on those issues. The Court certainly understands and appreciates the remedial nature of TILA and the Trustee's reasoning on the issue of unpaid finance charges and fees, but the procedural posture of this adversary proceeding does not allow the Court to grant this particular relief.[36]

**D.     Attorney's Fees and Costs**

Finally, § 1640(a)(3) provides for an award to a party establishing a TILA violation of "the costs of the action, together with a reasonable attorney's fee as determined by the court." The parties spent most of their respective briefs and arguments on the issue of what constituted a "reasonable" fee in this adversary proceeding, and the chasm between their numbers is staggeringly wide — Winterfox argues that $14,000 is the absolute maximum reasonable fee while the Trustee requests $526,546.07 in total fees and expenses *after* having taken certain voluntary reductions. "The burden is on the party requesting fees to prove its request is reasonable."[37]

---

[35] *Cf. In re Wentz*, 393 B.R. 545, 554-57 (Bankr. S.D. Ohio 2008) (discussing affirmative and defensive characterizations of TILA and HOEPA causes of action for § 1640(e) statute of limitation purposes).
[36] As such, the Court offers no opinion on the substantive merits of the Trustee's position.
[37] *In re Comm. Fin. Servs., Inc.*, 427 F.3d 804, 811 (10th Cir. 2005).

10

The parties agree on the non-exclusive list of factors that the Court should examine in performing this analysis, assuming a lodestar calculation based on "hours reasonably expended . . . multiplied by a reasonable hourly rate": (1) the complexity of the case; (2) the number of reasonable strategies pursued; and (3) the responses necessitated by the other side.[38] The attorneys' skill levels, the quality of the work, and the degree of success obtained are also relevant. On the last point, the Tenth Circuit has indicated that no precise rule or formula exists and that the Court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success."[39] Fee reductions in proceedings such as this one in which private statutory enforcement is encouraged should be expressed as an assessment of unreasonably expended time rather than "a requirement that the fee award have a particular relationship to the amount of the monetary recovery."[40] Good billing judgment must be exercised and "[h]ours that are not properly billed to one's *client* are not properly billed to one's *adversary* pursuant to statutory authority."[41]

The Court believes that reference to § 330(a)(3) of the Bankruptcy Code is also appropriate because the compensation is being sought by a professional employed by a chapter 7 bankruptcy trustee as plaintiff in this action. Section 330(a)(3) requires the Court to take account of "all relevant factors, including—

>  (A) the time spent on such services;
>  (B) the rates charged for such services;
>  (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under [title 11];

---

[38] *Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983), *overruled on other grounds by Penn. v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711 (1987).
[39] *Id.* at 556.
[40] *Id.* at 557.
[41] *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1204 (10th Cir. 1986).

11

> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under [title 11]."[42]

Unfortunately, both parties bear substantial responsibility for unnecessarily increasing both the length and expense of this adversary proceeding. As for the Trustee, he filed a Notice of Intent to Abandon both the estate's causes of action against Winterfox and the real property itself as "burdensome to [or] of inconsequential value and benefit to the estate" in early June 2008, just two weeks before he received $100,000 in estate funds, but then withdrew the Notice of Intent to Abandon in September 2008. The claims bar date was July 28, 2008, so the Trustee knew by that date how many creditors had filed proofs of claim seeking distributions from the estate.[43] Only six claims existed by that date, two of which were controlled by Winterfox either directly (Claim #6) or through affiliated entity JSH Holdings, LLC (Claim #4); two of which were minor IRS claims (Claims #3 and 9) totaling $4,204.57 that were ultimately reduced to zero in March 2010; and two of which were general unsecured claims totaling $4,936.56 (Claims #1 and 2). Winterfox filed its claim as oversecured, and the general unsecured claim purchased by JSH

---

[42] 11 U.S.C. § 330(a)(3); *see also Mares*, 801 F.2d 1197; *Comm. Fin. Servs.*, 427 F.3d at 811 (describing the "adjusted lodestar analysis" consisting of the § 330(a)(3) factors plus other relevant *Johnson* factors such as "the novelty and difficulty of the task, the requisite skill level, whether the case precluded other employment, the contingent nature of the fee, time limitations, the amount of money involved and results obtained, and the experience, reputation, and ability of the [professional]").

[43] Other than the IRS's Claim #9 which was ultimately reduced to zero in March 2010, it does not appear that any administrative expense claims against the estate had been asserted or paid by that point (or to date).

Holdings was for $40,652.88. The Debtor also listed a liquidated, undisputed, noncontingent unsecured claim for $1,100 in favor of R.C. Willey on Schedule F.[44] Thus, at best and assuming that Claim #2 did not supersede the R.C. Willey claim listed on Schedule F, $50,894.01 was the estate's total unsecured and administrative debt load as of the bar date, and the Trustee's counsel had only billed $8,134 in the adversary proceeding by that point, whereas the Trustee already controlled at least $100,000 in estate funds.

The Trustee was granted leave in March 2009 to file an Amended Complaint to add additional parties and claims, but he then failed to do so in a timely manner resulting in the Amended Complaint being stricken in June 2009 after a contested hearing on the matter. Also in June 2009, the Trustee stipulated to dismissal of most of the claims in the Complaint. Finally, the Trustee filed an objection to Winterfox's proof of claim in August 2009 that he amended on the last day of the three-day trial in this adversary proceeding — December 9, 2009 — and that was ultimately stricken by the Court in January 2010. In pursuing the TILA action, the Trustee and his counsel understood the difficulty of establishing actual damages under § 1640(a)(1) and admitted at trial that even the fees generated by that point in time were "outrageous." Even so, they hew to the position that a "reasonable" fee under § 1640(a)(3) is essentially whatever is required to establish a TILA violation. To date, the real property has still not been either liquidated or abandoned.

And as for Winterfox, it cannot expend substantial energy obstructing the Trustee's efforts to advance this adversary proceeding and then be heard to complain now that the Trustee has succeeded in establishing its TILA violations. When the Trustee attempted to abandon both the causes of action against Winterfox and the underlying real property in June 2008, Winterfox objected in the admitted hope of trying to get the action dismissed altogether rather than merely

---

[44] *See* FED. R. BANKR. P. 3003(b)(1).

13

abandoned. It also surreptitiously purchased Ed Ingram's Claim #4 through affiliated entity JSH Holdings, with JSH Holdings objecting to abandonment as well, and amended its own Claim #6 in late July 2008 to alternatively assert its full $1,525,942 claim as unsecured rather than oversecured if the Trustee successfully abandoned the property. After this pushback from Winterfox as the only secured creditor and JSH Holdings as the major unsecured creditor (as well as a prior failure in settlement negotiations), the Trustee ultimately withdrew his Notice of Intent to Abandon and the litigation continued.[45]

Winterfox then failed to fully and honestly cooperate in the discovery process, refusing to provide the Trustee with such basic information as the loans' APRs and, most egregiously, requiring the Trustee to root out Winterfox's own fabrication of inaccurate and backdated TILA disclosures that it used to defend itself against the allegations in the Complaint. And even now, the Trustee has been required to respond to Winterfox's attempted relitigation of decided issues such as the number of loans it made to the Debtor or whether the home was the Debtor's "principal dwelling." The recent substitution of counsel provides no excuse for this rehash, and the Court can only guess at the attorney's fees Winterfox has incurred in its defense of this adversary proceeding. Throughout this entire chapter 11 and now chapter 7 case, as Winterfox indicates, the Debtor has apparently been living in the home rent- and mortgage-free for nearly six years.

With this backdrop, the Court's task in determining a "reasonable" fee is a difficult one. Winterfox argues that the 50 hours affirmed in *Mares* at a rate of $280 is appropriate for a total award of $14,000; the Trustee argues that over 2,500 hours is reasonable even after certain

---

[45] At the post-remand hearing on December 17, 2010, the Trustee's counsel indicated that the Trustee took into account the stated views of the major estate creditors as well as the Debtor's potential equity interest in the estate in making his decision to withdraw his Notice of Intent to Abandon and proceed with the litigation.

14

voluntary reductions were taken. The Court has thoroughly reviewed the Trustee's fee statements and itemizations, but the Court finds that merely trying to excise particular line items is insufficient to reach an appropriate conclusion as to the reasonable number of hours expended in this adversary proceeding. Based on the underlying administration of the main bankruptcy case, the relative complexity of the issues in this adversary proceeding, the contributions of both parties to the length and expense of this adversary proceeding, the Trustee's ultimate degree of success on the merits before the Court and the District Court, and the relative billing rates of the Trustee's counsel, the Court finds that 750 hours is a reasonable number of hours spent in prosecution of this adversary proceeding at $200/hour for a total fee and cost award under § 1640(a)(3) of $150,000.

### III. CONCLUSION

For the reasons set forth above, the Court finds and concludes that the Trustee is entitled to statutory TILA damages of $4,000, $87,500 for prepaid finance charges, and $150,000 for attorney's fees and costs. A separate Judgment will be issued in accordance with these Post-Remand Findings of Fact and Conclusions of Law.

---------------------------------------------END OF DOCUMENT--------------------------------------------

\_\_\_\_\_ooo0ooo\_\_\_\_\_
**SERVICE LIST**

Service of the foregoing **POST-REMAND FINDINGS OF FACT AND CONCLUSIONS OF LAW** will be effected through the Bankruptcy Noticing Center to each party listed below.

Adam S. Affleck
Aaron Millar
Prince, Yeates & Geldzahler
175 East 400 South
Salt Lake City, UT 84111
*Counsel for Plaintiff*

David J. Jordan
Mark E. Hindley
Stoel Rives LLP
201 South Main Street, Suite 1100
Salt Lake City, UT 84111
*Counsel for Defendant*